EEOC v. Kronos, Incorporated EEOC v. Kronos, Incorporated Good morning, Your Honors. May it please the Court, with your permission, I'd like to reserve five minutes for rebuttal. It's granted. Broadly speaking, Your Honors, this case is about two issues. Number one, whether the District Court abused its discretion in failing to enforce the EEOC subpoena, and instead redrafting that subpoena in a manner that's far more narrow than the scope of the facts of this case and what the law would allow. Didn't the Court redraft it and narrow it to limit it to that which is relevant, namely disability discrimination, not race discrimination? Your Honor, the Court did redraft the subpoena in a way that it believed was relevant to the charge that Ms. Sandy filed with the EEOC, but that relevant standard that the District Court applied was not consistent with the broad, might-cast-light relevant standard that the Supreme Court articulated in the Shell Oil case. In addition, the District Court did not apply the correct standard with respect to expansion of an investigation when doing so is reasonable. Because a charge is not a pleading, the EEOC's investigation is not cabined by the four corners of a particular charge that a charging party files. A charge is just a starting point for an organic investigation that is free to grow as the facts warrant, as long as doing so is reasonable. In other words, a fishing expedition. No, Your Honor. The EEOC is not entitled to do a fishing expedition. You had a case where this woman who had a disability claimed that she was discriminated against because of a disability during a limited period of time with the help of the non-party Kronos and the subpoena covered more than just disability, more than just disability of the Kroger and more than just that time period. It was very broad-based. Why isn't that just a fishing expedition? See if there's anything else there. It's not a fishing expedition, Your Honor. The facts that came to light in the course of the EEOC's investigation warranted the particular inquiries that the EEOC made. When the EEOC asked Kroger, which is the respondent to the charge, for a position as to why Ms. Sandy was not discriminated against, Kroger admitted that Ms. Sandy was given an employment test that measured her personality. Ms. Sandy is a deaf, clinically deaf and speech-impaired individual. It's clear from the papers that were received by the EEOC that not only did Kroger admit that the test was applied to Ms. Sandy and that that was one of the reasons why she was not hired, but it's clear that the test may have affected, may have been, her performance on the test may have been affected by her disability. In investigating the test, the Kroger- Counsel, we understand the facts here, I think, but what Judge Lurie's getting at is this thing started at, walked into your doors at the EEOC as a disparate treatment disability case. As far as Kronos is concerned, it became a disparate impact race discrimination case. How do we, how do we bridge that? Is that really appropriate? It is appropriate, Your Honor, because you're right, Kronos portrays the case as Ms. Sandy walked in the door with a disparate treatment disability case, and now it's a disparate impact race case, and there's a big gap between the two. But what Kronos ignores, and what we believe the District Court ignored, is that there's a big red dot that connects those two, two facts, and really, it's a big red flag, which is the Scarborough article, which a Kronos employee authored, which the EEOC found in the course of this investigation, which says that the same test that was applied to Sandy has a disparate impact against African-Americans. You call that a root cause, that Kronos could be a root cause, I guess? The test itself, Your Honor, is a root, is a root source of discrimination that has an impact on people with disabilities and African-Americans. Now doesn't Kronos point out that the article made no mention of Kroger at all? Correct, Your Honor. The article did not mention Kroger. However, the article pertains to the same test that Kroger uses, and there's no differentiating factors that is apparent in the record that would distinguish the test as applied to the employer in the study, and the test as applied at Kroger. Can you give me an example of – I agree with you that if you're doing an investigation of a disparate treatment case and you find out somebody has taken an exam and the unfavorable action may have come from a disparate impact from the exam, that is a logical development of an investigation of this claim. But you – and I am inclined to agree with you that limitations on geography and time were – but limited to the test, the use of the test, is relevant to a disparate impact analysis. But that's where I have trouble. Your next step is – of course, it's a logical step from disability discrimination to racial discrimination. It isn't a logical step. And if the law limits your investigative power to the scope of the charge that is before you, as everybody acknowledges it does, what – give me an example of a case that would be beyond your authority if you can take – if you can properly take a disability discrimination case and say, I'm going to go off and investigate whether this employer is discriminating against race on the basis of race. Thank you, Your Honor. The Fourth Circuit in a case called EEOC v. General Telephone articulated very well the root source doctrine. And in that case, the EEOC was investigating a charge alleging discrimination against an African American and determined that a test was a root source, which also may have been discriminatory against women. Those are two separate bases of discrimination. That's the principle that we're applying here. Now, you're asking what the limiting principle is. And the limiting principle is the principle of reasonableness. Now, obviously, that is a contextual and fact-based determination. But our contention here is that in investigating the test, the EEOC's investigator would have been negligent not to read the statements in the Scarborough article and conclude that the same test that he's investigating with respect to Sandy deserves to be investigated with respect to African Americans. Well, doesn't the statute provide you authority to, if you think independent of this charge, to bring a commissioner's charge if you find something that you think something wholly different that violates the statute? Yes, Your Honor. The statute does provide the commission the authority to issue commissioner's charges are most appropriate when there is no charge that can reasonably be expanded to include the additional information that the EEOC seeks. In this case, we have a charge. The charge alleges disability discrimination. That's true. But it's clear that the test is one of the facts that the EEOC must investigate in order to get to the bottom of what happened. And in investigating that, we discovered in the due course of a reasonable investigation that the same test may have a disparate impact, not just against persons with disabilities, but against African Americans and Hispanics as well. So EEOC, in fact, found this evidence in the course of a reasonable investigation. We didn't hope to find it and launched an investigation to find it. We found it, and we're trying to seek relevant information to determine whether the law was violated. Could you elaborate? I thought an interesting point in your brief was the confidentiality clause, and in particular, the clause that dealt with destruction of records. You say that violates the Federal Records Act. Could you elaborate on that a little bit? Yes, Your Honor. It's our understanding that the Federal Records Act does not allow the EEOC to destroy records. It's not in accordance with a schedule that's given to the EEOC by the National Archives and Records Administration. We often get inquiries from members of Congress. We get FOIA requests. And the EEOC's document, the documents within an EEOC file, the notes that the EEOC takes, the other papers, are government records. And we cannot just destroy those records without complying with the Federal Records Act. You can return records to the named party, to the employer, right? I believe we could return records. However, I don't believe there's any prohibition against copying records and keeping those records in our files as a copy. Thank you, counsel. Thank you. Good morning, Your Honors. I'm Laurent Sash, privileged to represent Cronos in this matter. I believe counsel meant to say EEOC v. General Electric, not General Telephone from the Fourth Amendment, the gender information to supplement the race. And so they waived any objection and consented to it. And they also had the embarrassing situation that they were giving separate tests for men and women, which, so you know, it's an old test, an old case of that fact. If you want to move that microphone up a little bit, please. Sorry. Excuse me, Your Honor. There are a number of things that we agree on in this case. And the first is the standard of review. It's abuse of discretion on both issues, except for any factual determinations, which would be clearly erroneous. And if an employer voluntarily provides data to the EEOC, which expands its areas of inquiry, then the employer can't later object to the broader determination or the broader scope of the suit. And that's the General Electric case we just mentioned. So far as we're aware, no reported court decision has ever allowed the EEOC to cross statutes in investigating a charge. And here they're trying to go for it. But Mr. Ash, isn't this case about relevance? And hasn't the Supreme Court in this court interpreted relevance in this context quite broadly? Judge Laurie, that's absolutely correct. But the seminal case is the Shell Oil case. And in that case, it expressly says that it's limited to investigation of the charge, meaning the charge in front of the agency, which is the Disability Act charge. Within that, yes, they can go broadly. That's kind of a mixed bag, isn't it? There's also language in Shell Oil that says it's a broad grant of authority. But they specifically anchor it to the charge that's before the agency. Now, the irony of this is, number one, as Judge Stapleton indicated, they could file a commissioner's charges against Kronos Clients, who were published in the Wall Street Journal as being Kronos Clients. They filed them against Best Buy and against CBS. Secondly, they claim that they've got several race charges against Kroger, hiring race charges. Now, they haven't produced them, despite consent from Kroger. And they haven't produced them in camera for the district court. But they claim they've got them. Well, if they've got them, they could have used those as a vehicle for investigating race data on the Kronos test, if the Kronos test. You don't think we should be giving that consideration? I think that they should go that way and not under a simple Disability Act charge in one store in West Virginia by a white female. Let's talk about the other restrictions. I mean, the geographic restriction you say is invalid, the time restriction you say is invalid, the limited limitation to Kroger is invalid. Why is that? But all of that is related to the test. We think. And isn't all of that a disparate impact? Isn't that all relevant to whether this test has a disparate impact on people in Sandy's situation? Well, several responses to that, Your Honor. Number one, we think the district court got it right and in fact was generous to the EOC. This subpoena was so broad and so far afield, the court simply could have denied it as other courts have done and said, you know, start over with something more reasonable. He didn't do that. But it's a bit moot in that Kronos has zero information about Ms. Sandy's disability or anybody else's disability. We don't ask that question. It would be illegal to ask that question under the Americans with Disabilities Act. There's no form that you fill out. You go to a computer terminal in a Kroger store and you take it at a computer terminal. There's no question on either of these two tests that has anything whatsoever to do with whether you have a disability and whatever it is. And unlike race or gender, disability comes, you can be deaf, you can be speech impaired, you can be blind, you can be paraplegic, you can be lots of things. There's not a generic, quote, disability class. And the court will note there's no description from the EOC as to what the class description is and there couldn't be. And there's no such thing as a class of, quote, disabled, close quote. So you're saying that the test actually favors the policies of the act. Absolutely. Because it's more objective. Absolutely. And it is, there's no question. We've produced the test and the answers for the EOC. They've not identified a single question or answer which they claim would surface the fact that Ms. Sandy was deaf or speech impaired. By the way, Kronos has never had that information and indeed the only place it's in the record is in the EOC briefs. All right, well then, you have this article that they're citing too that seems to, or at least in your adversary's view, seems to indicate that it has an impact on minorities. And I'm delighted. Negative impact. And that's interesting too because they've submitted a declaration, five-page declaration from Dr. Richard Tomowski, who's their chief staff psychologist, and it appears at pages 192 to 196 of the record. And he claims that there is adverse, it shows adverse impact on grounds of race and Hispanic status on the test. Unfortunately, Dr. Tomowski, in direct violation, and I think this was an innocent error, he calculated that based on the higher ratios of the employer whose data was the subject of that article, which was not Kroger, by the way. And it was a different employer in a different business and in a different applicant population and we would say it's not applicable. However, there are two, there are three separate tables and table 2A, which appears on page 296, I believe, excuse me, 196, is the one that relates to results on the Cronus test. Table 2C relates to the hiring ratios of that specific employer. If you do it with the correct chart, you find that, and Kroger used both yellow and green scores. Ms. Sandy, by the way, took our two tests. She got a green on one, which is a high pass, and a yellow on the other, which is a low pass. And she was screened in to interview. She passed our hurdle and went on in to be interviewed. Is that why you say, I noticed several times you represented in your brief that this test wasn't even a factor in her failure to be hired, is that why? We believe that's why. And the EOC implies in a footnote that we report percentile scores on these tests. That's not true. We solely report green and yellow. And the court might be interested in looking on page 6 of our brief footnote 3, where we show several of the questions that Ms. Sandy answered and how she answered them. And it's no great surprise that she only got a yellow on the issue of customer service or attention to customer service. And none of them have anything to do with being either deaf or speech impaired, as the case may be. She said, for example, that she strongly agreed that, quote, she doesn't care what people think of her, and that, quote, people's feelings are sometimes hurt by what she says. That's strongly agreed. She agreed that what she says, whatever is on her mind, close quote, quote, does not fake being polite, close quote, quote, isn't afraid to tell someone off, close quote. This may not be an ideal personality set to be a cashier or a deli clerk in a grocery store, if any of us encounter it. None of those questions has the slightest thing to do with being deaf or speech impaired. But that's where she is. But any event, if you look at the actual numbers, if Dr. Tanowski had done it correctly and used the correct chart, the black, and by the way, he adopts the four-fifths rule, which is in the EOC, in the Uniform Guidelines on Police Selection Procedures, and it's paragraph 3B of his declaration. He says that's what controls. Well, the black-white ratio, using the four-fifths rule, I'm sorry, I'm, the four-fifths rule says that if the minority or the protected group pass rate is at least four-fifths or 80% of the majority pass rate, the comparator pass rate, then it's not adverse impact. And that's what Dr. Tanowski says is the proper test. If we look at that using the proper chart, which is performance on the Chronos test, the black-white ratio is 91.3%, and the Hispanic-white ratio is 94.9%, both way, way past the four-fifths rule or the 80%. And I've got those correct numbers and ratios done from the right chart on a single piece of paper if the court would like for me to leave those with your clerks. And I'll give one, of course, to Mr. Anderson. This is something that's not been in the record? It is in the record if you go, but you've got to go to Dr. Scarborough's roughly 50-page article and you've got to pull it out of there and then you've got to look and see what Dr. Tanowski did. Well, you know, is this something the district court considered? No, I don't think the district court, the district court thought race was irrelevant and inappropriate for a subpoena, so it didn't get to it. It sounds like you put this together. Yes, we've connected the dots to the extent they connect at all, but we, frankly, I didn't discover until Tuesday night preparing for this that Dr. Tanowski had, in fact, used the wrong chart. I was very surprised that he claimed there was adverse impact on race because personality tests usually don't have adverse impact against protected groups. Why don't you just make a motion to supplement the record? It'll give your adversary a chance to be heard on that, okay? Yes, sir, Your Honor. On the confidentiality question, the courts have long recognized that employment tests and validation data present an especially strong standard for strict confidentiality constraints, and that goes all the way back to the Supreme Court in Detroit Edison versus NLRB. But how about destruction of the records? You didn't reply to that at all, actually, in your brief. The – I think it was raised in their reply brief, so we didn't get a reply. But I – our primary concern is that our records that we provide to them be returned to us. Frankly, I'm not – I don't have an answer I'm comfortable with on whether they have to – whether they're permitted to destroy their notes, but they can certainly – there's nothing prevents them from returning what we give them back to us, and we absolutely don't want our tests and validation data sitting in their file. But we're also reviewing an order, and if it's violative of federal law, then that could be a problem. Well, they have the option of returning it to us, and I agree, Your Honor, and a couple of things on that. Number one, the order – at any time, they can go seek modification of that order, and in fact, the trial court said if you don't – once Kronos has complied with our production, if there's more specific documents you want, ask for it. And we complied on August 28th of last year, and they have not sought a single additional document. In addition, if they feel that the constraints are actually too onerous, they can seek modification of the trial court. They have not sought any such modification. They now object to the fact the trial court used their own definition of confidential. They put it in their proposed order, the trial court adopts it, and now they said, oops, we want a do-over. Well, the way to do that is to ask the trial court to correct it, not to come here. Counsel, Judge Lurie has a question. Don't you have a waiver argument regarding the FIOA – FOIA portion? Oh, absolutely. I mean, they – by submitting their definition, they waived any objection to that. Can they waive the FOIA? I would have thought they were not the primary – certainly not the solely party in interest when Congress passed the FOIA. If they get a FOIA request that surfaces this problem, then they can – and if they believe that they're caught between the rock and the hard spot, all they've got to do is I hope they'd first call us and see if we can resolve it. But subject to that, they can go to the trial court and say, look, we've got a FOIA request We think we have to do this. We request the court to modify it. And that's the proper way to do it, not here. There – I mean, there is no apparent abuse of discretion in this case on the part of the trial court in coming up with this confidentiality. Or the court was in a situation where the parties didn't agree, and each party submitted its own version. It's sort of like the baseball arbitration. You pick one or the other, and the court picked ours. But the court then modified it, and when it – to the extent it did, it modified it in the direction of the EOC. And as I keep saying, these are not orders that are in stone that can never be changed. If they've got a problem, they – the court invited them to come back for additional documents. The court also – always, just as we can move to enforce it, they can move to modify. And that's where this – Isn't there a rather extensive scheme that Congress has crafted to protect the interests that this order purports to be protecting? And shouldn't we at least require – if somebody wants protection in addition to the rather broad protection that Congress has set up, shouldn't there have to be some reason given why that statutory scheme needs to be supplemented? Yes, and there absolutely is here, Your Honor, because the protection is a fine of a maximum of $1,000 and a potential misdemeanor. There's no civil remedy. Test – national test designers and publishers such as Cronos spend literally millions of dollars developing these tests, and if test security is violated, they risk losing the test. Not only did Troy Edison in the Supreme Court recognize this, but EOC versus Aon Consulting cited at page 38 of our brief, and EOC versus C&P Telephone cited at page 38 of our brief. Both are ones in which an extremely strong interest, and as – in Aon Consulting, the court said, present, quote, an extraordinarily compelling case for confidentiality, close quote. We've got no remedy. And incidentally, as far as I'm aware – I'm sorry. I missed that. Where in the record did the district court tell us why it was doing what it was doing? No, I'm – This district court in this case. The court, I think, indicated in – both parties briefed this, and we briefed strongly the need for confidentiality of an employment test and the validation data. It's not only risk violating test security, but also a risk of wasting our investment and letting our competitors see what we did by validation, what we did by looking for less adverse alternatives. And our competitors would be, in a major way, advantaged if they could do this. In addition, if our tests are in the permanent EOC library, if you will, this is a major business disadvantage to us as compared to our competitors, as you can imagine. Who wants to go use a test that's in the EOC's permanent, we-don't-like-you file? All right. Thank you, counsel. Thank you. Thank you, sir. Your Honors, Kronos is correct that the district court's order did say that the EEOC, if it felt that Kronos' production of documents was insufficient, could go back to the district court. However, there's nothing in the district court's opinion in which the district court misapplied the broad relevant standard, misapplied the law as it relates to the EEOC's suspension of investigations. There's nothing in that order which would suggest that if we were to go back to the district court, it wouldn't misapply those standards again. Is there anything inherently improper about it? I understand that the Congress' scheme set forth in FOIA. Is there anything inherently objectionable about a court order that might add to that overlay as, I guess, the district judge did here? Yes, Your Honor. The court, this court, in- In other words, giving somebody like Kronos more protection, let's say. The EEOC fully recognizes that a test maker and vendor has a confidentiality interest in those products. However, Congress, as Judge Stapleton noted, has provided for confidentiality of EEOC investigations. In addition, there are extra protections. Trade secrets are not to be disclosed to the charging party or to the respondent or to anyone outside the agency at any time. So there are already adequate protections for trade secrets and confidential commercial information. This court in Pansy v. Burroughs-Strasburg said that when a government entity is involved, district court should narrowly draft confidentiality orders and should consider and put in the record the reasons for any more expansive protections of confidentiality. In this case, the district court simply took Kronos' proposed order, added to that proposed one, some then what even Kronos suggested, and provided no rationale for why it did so. Your Honors, Mr. Ash noted that there's no reason why the EEOC shouldn't or couldn't obtain a commissioner's charge in this case. Well, that's true. The EEOC does have authority to issue commissioner's charges in any case, but again, commissioner's charges are most useful when there is no charge that can be reasonably expanded. In this case, we reasonably expanded the investigation in a way that's, in essence, would be negligent not to. I just had a general question. With respect to commissioner's charge, what is the difference between your jurisdiction and Department of Justice's Civil Rights Division, where they investigate civil rights violations? Does it kind of intersect? The commission conducts investigations of all charges filed against both private sector employers and public sector employers, governments. However, EEOC does not have litigation authority against public sector employers. EEOC will transfer the case to the Department of Justice to litigate a case against, say, a fire department or a police department. But the EEOC does have litigation authority against private sector employers. Your friend across the way says, first of all, that the test, the record demonstrates that the test had no effect on the decision not to employ her. And secondly, I think I understand him to say that this is a situation where disparate impact is irrelevant. It's impossible for there to be a disparate impact here that's relevant. What do you say to this? The record simply does not reflect that, Your Honor. Ms. Sandy took an – Ms. Sandy is deaf and – clinically deaf and speech-impaired. She was presented with a number of questions that she had to either agree or disagree with, strongly or not strongly. She answered one question, which was, you like to talk a lot, as strongly disagree. It doesn't take a leap of logic to figure out that someone who's deaf and speech-impaired may be more likely to answer that question in the way that she did. And Cronus' own test summary of Ms. Sandy's answers and how those answers should be interpreted told the interviewing manager in clear terms, Ms. Sandy is less likely to be able to listen carefully, understand, and remember. It's, again, not a leap of logic to determine that a person who's deaf and speech-impaired may answer questions in a certain way, given the content of those questions, and that the test to a person with a disability. Can there be a disparate impact? Is that an illogical concept in the context of this kind of test? Yes, Your Honor. The Americas with Disabilities Act contains two provisions, 12116 and 12117, which both govern disparate impact. One is a more broad standard of a test or other qualification standard that has a disparate impact, and the second provision says that if a test is likely to be impacted by a person with a disability, then that may be a violation as well. Both of those provisions are implicated in this investigation. Now, we don't know whether we're trying to investigate the facts, so we don't know whether those provisions were, in fact, violated in this case. We're trying to get the information, both to Sandy and to all the persons who took the test, as to whether that's true. Thank you. Thank you, counsel. Thank you, Your Honor. Thank you, counsel, for a well-briefed and well-argued case. Thank you, Your Honor.